FILED
2010 Jan-20 PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DR. ROSALIA N SCRIPA,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CV-08-BE-2043-S** |
| | ] | |
| **BOARD OF TRUSTEES OF THE UNIVERSITY OF ALABAMA,** | ] | |
| | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

This case comes before the court on "Defendant's Motion for Summary Judgment" (doc. 25). The parties have fully briefed the motion. Plaintiff Scripa asserts that the Defendant University paid male employees who performed equal work higher salaries and stripped her of her administrative position when she complained about the differences in pay between men and women in violation of the Equal Pay Act.[1] For the reasons stated below, the Defendant's motion for summary judgment (doc. 25) will be DENIED. The court will simultaneously enter a separate order to that effect.

## FACTS

The following facts are viewed in the light most favorable to the non-moving party, *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999), and are the facts only for summary judgment purposes.

The Plaintiff, Dr. Rosalia Scripa has been employed as a faculty member with the

[1]Plaintiff does not bring Title VII claims against the Defendant University.

Defendant's UAB campus for over thirty years. She held positions as Associate Dean of Academic Programs in the School of Engineering, Associate Provost for Undergraduate Programs, Associate Provost for Undergraduate Programs and Faculty Affairs, and Associate Provost for Faculty Affairs and Faculty Development (AP for FA-FD). During her employment, she periodically brought complaints of gender inequity to the attention of Dr. Capilouto, the University Provost and Plaintiff's direct supervisor.

Plaintiff Scripa contends that her salary for her work as Associate Provost for Undergraduate Programs and Faculty Affairs and AP for FA-FD–$191,649 to $195,482– was less than the salaries of the following men who performed equal work under the same working conditions:

| | Position | Salary (December 31, 2005 to December 31, 2006) |
|---|---|---|
| Dr. Louis Dale | Associate Provost for Equity and Diversity; Vice President for Equity and Diversity | $217,366 to $234,755 |
| Harlan Sands | Associate Provost for Finance and Administration | $200,000 |
| Dr. Lowell Wenger | Dean of the School of Natural Sciences and Mathematics | $192,709 to $206,208 |
| Dr. Robert Holmes | former Dean of the School of Business | $228,264 to 239,678 |

| | | |
|---|---|---|
| Dr. Harold Jones | Dean of the School of Health Professions | $228,264 to 239,678 |
| Dr. John Amos | Dean of the School of Optometry | $202,230 to $215,375 |
| Dr. Bharat Soni | Chair, Mechanical Engineering | $206,082 to $222,569 |
| Dr. Barry Andrews | Chair, Materials Science & Engineering | $213,715 to 228,675 |

Plaintiff's Employment Contract

In 2000, Defendant offered, and Plaintiff accepted the position of Associate Provost for Undergraduate Programs. Dr. Peter O'Neil, former University Provost, negotiated an agreement with the Plaintiff to become Associate Provost for Undergraduate Programs; the current Provost, Dr. Eli Capilouto, had nothing to do with that agreement. The agreement provided that if Plaintiff were to return to her prior position in the School of Engineering as Associate Dean, she would do so at a 9-month salary equal to 80% of that year's 12-month salary she would have earned as Associate Provost. As Associate Provost for Undergraduate Programs, Plaintiff was heavily involved in the process of making strategic decisions about new programs and curricular changes.

In 2001, upon the retirement of former Associate Provost Dorothy Mueller, Plaintiff took on part of Mueller's duties as Associate Provost for Faculty Affairs; consequently, Plaintiff's title changed to Associate Provost for Undergraduate Programs and Faculty Affairs.

When Plaintiff Scripa became aware that, Dr. Arol Augsburger, Dr. O'Neil's successor,

was leaving UAB, she sent him a request dated August 16, 2002 asking whether if she returned to her tenured position in the School of Engineering she would do so as a twelve-month faculty member at a salary equal to the year's 12-month salary as Associate Provost and also retain her 12-month sabbatical at full salary before returning. Dr. Augsburger's response was to adhere to the original commitment to the plaintiff made by previous Provost O'Neil "with the understanding if [Scripa chose] to take a full sabbatical, it would be at the full associate provost level."

Dr. Eli Capilouto became the interim provost, or chief academic officer, of UAB in 2002; he supervised Plaintiff's work. Plaintiff informed Dr. Capilouto that she was overworked; in addition, Dr. Capilouto wanted to expand the undergraduate programs aspect of his office. In light of these facts, Dr Capilouto decided to divide Plaintiff's job into two positions, Associate Provost of Undergraduate Programs and Associate Provost for Faculty Affairs and Faculty Development (AP for FA-FD). Thus, Plaintiff's assignment and title changed to AP for FA-FD in 2005.

Plaintiff's Duties as AP for FA-FD

Part of Plaintiff's job as AP for FA-FD was to receive complaints–including complaints of gender inequity–of faculty members and to communicate those complaints to the Provost. Dr. Capilouto became visibly upset when she would bring up salary inequities in meetings. Plaintiff also managed her office personnel and unit directors and handled a $3,633,871 budget–albeit smaller than her comparators' budgets. Dr. Scripa also had some responsibility for non-grant fund raising. Further, Plaintiff performed the initial review of all tenure and promotion packages and discussed her recommendations with Dr. Capilouto.

At the time Plaintiff's title and duties changed, Plaintiff became principal investigator (PI) of a grant from the National Science Foundation (NSF) known as the ADVANCE grant. The ADVANCE grant was a NSF grant valued at $3,500,000. The purpose of the grant was to advance the careers of women in academic science and engineering. An administrator from NSF expressed concern to Dr. Capilouto about whether Plaintiff had too many responsibilities to take on the ADVANCE grant. Dr. Capilouto responded to the administrator that the undergraduate program responsibilities would be removed from Plaintiff's job duties, allowing her time to perform the duties associated with the ADVANCE grant. Once the ADVANCE grant administrator learned that Plaintiff would no longer be responsible for undergraduate program duties, the administrator did not express any other concerns about Plaintiff taking on the PI role.

Administration of the ADVANCE Grant: Matched Pairs or Regression Analysis?

Dr. David Corliss, a statistician in the Provost's office, performed a salary study for the ADVANCE grant. During a meeting regarding which methodology to use for the grant, Plaintiff pointed out that the ADVANCE grant mandated use of a regression analysis instead of a matched pairs analysis. Plaintiff alleges that Dr. Capilouto called this meeting to find a new way to view salary data so that UAB could present the data in a light more favorable to UAB.

In the spring of 2006, Dr. Corliss chose a matched pairs methodology to analyze faculty salaries for the grant. Plaintiff disagreed with the decision to change the method of presenting faculty salary data in the third-year annual report on the ADVANCE grant, from data collected for the Alabama Commission on Higher Education,[2] to a matched pairs analysis. Plaintiff

[2]The data UAB submitted to the Alabama Commission on Higher Education showed that the average salary for females at UAB is less than the average salary for males; however, that data is not entirely conclusive regarding institutional gender bias in faculty salaries because the

contends Dr. Capilouto overrode her objections and allowed Dr. Corliss to apply the matched pairs analysis instead of the regression analysis to mask gender-based pay inequities.

Dr. Corliss testified that no one pressured him to use "matched pairs" instead of a regression analysis for purposes of analyzing faculty salaries. Dr. Corliss also testified that he had no starting hypothesis when he did the ADVANCE grant salary equity study. Dr. Corliss's findings, using the matched pairs analysis, suggest no systematic gender bias in salaries at UAB.

Dr. Capilouto testified that UAB had no intent to show less of a pay difference between men and women when the university chose to use a "matched pairs" rather than a regression analysis for the ADVANCE grant; in fact, Dr. Capilouto asserts that Dr. Corliss and Plaintiff recommended the use of the "matched pairs" analysis. Also, Dr. Capilouto contends that Plaintiff Scripa told Dr. Capilouto that other universities that had ADVANCE grants were not using a regression analysis. Further, Dr. Capilouto maintains that he never saw a regression analysis of UAB faculty salaries in the two years prior to the summer of 2006.

Plaintiff's Work Performance

Defendant asserts that despite having a significant portion of her job allocated to another position, Plaintiff continued to have problems performing in her AP for FA-FD position. In particular, Dr. Capilouto testified that he watched the Plaintiff "struggle with managing her organization, her personnel, and her work." On the other hand, Plaintiff contends that while Defendant took away a significant portion of her duties, Defendant also added a large number of duties. Plaintiff asserts that when she took the position of AP for FA-FD, her job responsibilities

---

data does not control for variables such as whether the faculty member is tenure-earning, within different disciplines, and length of time in rank or performance.

actually increased.  Further, Plaintiff insists that Dr. Capilouto did not apprise her of any problems with her performance.

On the other hand, the Defendant declares that prior to making the decision to remove Plaintiff from the AP for FA-FD position, Dr. Capilouto periodically attempted to point out the areas where she needed to improve by having discussions with Plaintiff regarding her struggle. Plaintiff responded that she felt that the work of her office was not getting done and that she would rather do it herself than get an employee under her management to a "state where they could handle the work." According to the Defendant, the Plaintiff failed to address problems with her staff and had a tendency to internalize all the work that her staff could not do; thus, Plaintiff's approach was not successful.

Plaintiff disputes Defendant's version of the facts.  Plaintiff maintains that Dr. Capilouto did not speak to her about problems he observed.  She asserts that he never told her that he was losing confidence in her ability to do her job.  Plaintiff states that when she sought help from Dr. Capilouto with problem employees, Dr. Capilouto denied her the resources to solve the problems.  According to Plaintiff Scripa, Dr. Capilouto also refused to allow Plaintiff to hire new employees.

Dr. Capilouto received expressions of concern from other deans regarding delays in getting work out of Dr. Scripa's office.  In June of 2006, the Dean of the School of Health Professions, Dr. Harold Jones, met with Dr. Capilouto.  Dr. Jones expressed that he and other deans had been discontent with Plaintiff's performance for a long time and recommended to Dr. Capilouto that the Plaintiff be replaced.

<u>Termination of Plaintiff's Duties as AP for FA-FD</u>

In October 2006, Dr. Capilouto made the decision that Plaintiff would not continue in her position as Associate Provost. Dr. Capilouto made his decision weeks before he met with Plaintiff on October 30, 2006 to tell her of his decision. At the time of the meeting, Dr. Capilouto had begun an evaluation with Plaintiff, but did not complete it because he had already reached the decision that she would not continue in her position as AP for FA-FD.

Dr. Capilouto, Plaintiff Scripa, and Cheryl Locke, Chief Human Resource Officer for the University, attended the October 30, 2006 meeting. In this meeting, the Defendant asserts that Dr. Capilouto told the Plaintiff that she was not well suited for her administrative position. Plaintiff asked Dr. Capilouto what he meant and he responded that it was his prerogative not to tell her.

After making changes to the resignation letter she received at the meeting, Plaintiff signed it on November 7, 2006. Plaintiff's resignation letter states

> After much thought, and for personal and professional considerations, I have decided to step down from my administrative appointment as Associate Provost for Faculty Affairs and Faculty Development effective no later than December 31, 2006. It is my intention to work with you to ensure a smooth transition over this time period.

On the same day Plaintiff signed the letter, Dr. Capilouto sent Plaintiff a letter outlining the terms of her removal from the position. The terms honored the agreement that she had made with the previous provost, Dr. Augsburger, with respect to her salary. Specifically, Dr. Capilouto advised Plaintiff that she would keep her full associate provost salary of $195,482, including the administrative supplement, for a period to include a paid one year sabbatical following her stepping down, or until February 28, 2008. Plaintiff signed this letter.

After Plaintiff resigned, the University posted the available associate provost position.

Plaintiff applied and interviewed for the job, but Dr. Capilouto decided to hire Dr. Claire Peel, a woman, to replace Plaintiff as the permanent AP for FA-FD.

**STANDARD OF REVIEW**

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In this case, for purposes of summary judgment,

the Defendants do not dispute Plaintiff's claim that she was not paid for overtime. Thus, the court must determine whether TLC is entitled to judgment as a matter of law.

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282. The non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

**DISCUSSION**

Plaintiff Scripa asserts that the Defendant violated the Equal Pay Act (EPA), 29 U.S.C. § 206(d), by 1) paying her less than it paid males who performed equal work, and 2) terminating her from her Associate Provost position because she complained about salary inequities between men and women.

I. Prima Facie Violation of the Equal Pay Act

To establish a claim under the Equal Pay Act of 1963, a plaintiff "must show that an employer pays different wages to employees of the opposite sexes 'for equal work on jobs the

performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (1992) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. § 206(d)(1))). The Defendant University asserts that the Plaintiff cannot show that she was paid less than a male employee who performed equal work under similar working conditions.

The Equal Pay Act, 29 U.S.C. § 206(d)(1) provides "[n]o employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex." Thus, to present a valid EPA claim, Plaintiff Scripa has the burden of showing that she worked within the same "establishment" as the men she who received higher salaries.

The Defendant argues that because all of the higher paid men worked in physically different areas of UAB's campus, they are not part of the same establishment for purposes of Plaintiff's EPA claim. "[T]he term 'establishment' . . . refers to a distinct physical place of business rather than to an entire business or 'enterprise' which may include several separate places of business. Accordingly, each physically separate place of business is *ordinarily* considered a separate establishment." 20 C.F.R. § 1620.9. In making its argument, however, the Defendant fails to recognize that "functional unity" is also one of the indicia of an "establishment." *See Mitchell v. Gammill*, 245 F.2d 207, 211 (5th Cir. 1957) (holding that a market, liquor store and restaurant operating in conjunction with a neighboring barbeque stand

constituted one establishment for FLSA purposes).[3]

Further, the Eleventh Circuit recognizes that "central control and administration of disparate job sites can support a finding of a single establishment for purposes of the EPA." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 591 (11th Cir. 1994). Even though the Plaintiff's male comparators worked in different locations on UAB's campus, the facts show that they all, with one exception,[4] were under the centralized control of the Provost; therefore, the various administrative offices were functionally unified. Accordingly, a reasonable trier of fact could conclude that the Defendant's University campus is a single educational establishment for EPA purposes.

Next, the Defendant asserts that it is entitled to judgment as a matter of law on Plaintiff Scripa's disparate pay claim because the undisputed facts show that she cannot point to a male faculty administrator who was paid more for performing *equal work* under similar working conditions. The standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high. *Mulhall*, 19 F.3d at 592 (citing *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799 (11th Cir. 1989). "When Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that 'the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other'." *Waters*, 874 F.2d at 799 (quoting *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973)). The EPA's prohibition of pay discrepancies was meant "to apply only to jobs that are substantially

---

[3]*See also, Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[4]The Vice President for Equity and Diversity reported directly to the University President.

identical or equal." *Id.* .

The Defendant argues Plaintiff Scripa has not presented facts of an EPA violation because not one of the men identified by Plaintiff had the same job title as Plaintiff. Defendant's argument fails because the identity of job titles is not dispositive of the issue of substantial identity of job functions. Rather, identity of job titles is only a factor for consideration. *See Mulhall*, 19 F.3d at 592. Plaintiff's EPA claim does not fail simply because she had a different job *title* than her male comparators if she can show her job was substantially identical or equal to those of men who received higher salaries.

Defendant also contends that Plaintiff's position as AP for FA-FD was unique; therefore, Plaintiff cannot establish that she performed work of the same skill, effort, and responsibility as a male administrator working under similar working conditions. This argument is not persuasive because a fact-finder could determine that even though unique, Plaintiff's job was substantially *similar* to the jobs of her male comparators. *See Mulhall*, 19 F.3d at 597 (finding genuine issues of material fact as to whether plaintiff and comparators performed substantially similar work and reversing district court's grant of summary judgment).

The Defendant University also contends that the Plaintiff has failed to present sufficient facts to withstand summary judgment because her duties and responsibilities as Associate Provost differed from the duties and responsibilities of her comparators. Specifically, the Defendant asserts that unlike the Plaintiff, the responsibilities of her comparators included evaluating faculty, department chairs and associate/assistant deans; fundraising; developing curricula and degree programs; maintaining and staffing facilities; reviewing conflicts of interest; recruiting; and implementing community service programs.

Defendant further asserts that one of the most significant distinctions between Plaintiff's job and that of her male comparators relates to responsibility for financial matters. Defendant argues that differences in financial areas of responsibility constitute key distinctions that prevent a plaintiff from showing that she has equal responsibility with a comparator. The undisputed facts also show that plaintiff handled a much smaller budget than her purported comparators and had little, if any, responsibility for non-grant fund raising.

Plaintiff, however, has presented facts to counter Defendant's contention. While Plaintiff presents no evidence that she was directly responsible for budgets similar in size to her comparators' budgets, a reasonable fact-finder could find that her work on the ADVANCE grant in combination with her other financial duties was substantially similar to jobs that included handling larger budgets. The Plaintiff presented evidence that as AP for FD-FA, she had the responsibilities of managing her office personnel and unit directors, performing the initial review of all tenure and promotion packages and discussing her recommendations with Dr. Capilouto. Also, Plaintiff as the principal investigator (PI) administered the ADVANCE grant–a grant valued at over three million dollars. Additionally, Plaintiff was responsible for a $3,633,871 budget.

Further, Dr. Scripa has presented evidence that she evaluated faculty, influenced curricula, and reviewed the university's conflict of interest policy. Plaintiff also stated that she, like most of her comparators, reported directly to Dr. Capilouto. Plaintiff Scripa also testified that she worked on student recruitment, interviewed scholarship students and honors program students, and served on the admissions appeal committee.

In summary, the Plaintiff presents facts sufficient to dispute whether her responsibilities

differed from her comparators' responsibilities.  As such, questions of material fact remain as to whether the Plaintiff's job duties were substantially similar to her male comparators.  Because the Plaintiff has raised genuine issues of material fact as to whether the Plaintiff's job was substantially similar to her comparators' jobs, the court will deny the Defendant's motion for summary judgment of Plaintiff's disparate pay EPA claim.

II.     Defendant's Burden to Justify Differences in Pay

Because the court finds that Plaintiff Scripa has raised genuine issues of material fact as to her disparate pay claim under the Equal Pay Act, the burden shifts to the Defendant Board of Trustees to show that no issue of material fact exist as to whether the differences in pay are justified by one of the four exceptions in the Equal Pay Act.  Those exceptions are "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *See* 29 U.S.C. § 206(d)(1).

The Defendant's burden to show that these affirmative defenses entitle the University to judgment as a matter of law is heavy.  The Defendant must demonstrate that "the factor of sex provided no basis for the wage differential." *Mulhall*, 19 F.3d at 590.  In *Mulhall*, the Eleventh Circuit "note[d] the difficulty inherent in disposing of such an issue by way of summary judgment. Credibility and the weight to be given such 'explanations' are traditionally matters left to the consideration of fact finders." *Id.* at 595.

The Eleventh Circuit requires that the Defendant present "an explanation of how those factors [other than sex] actually resulted in an individual employee earning more than another." *Brock v. Georgia Southwestern College*, 765 F.2d 1026, 1037 (11th Cir. 1985), *overruled on*

*other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). Defendant contends that even if Plaintiff Scripa could establish a claim under the Equal Pay Act, she cannot overcome Defendant's affirmative defense that any differences in pay were based on a factor other than sex. Defendant argues that it is entitled to judgment as a matter of law because any difference between Plaintiff's salary and her male comparators stems from a differential based on a factor other than sex: the difference in duties between Plaintiff and the men who received higher salaries. Because the record is replete with factual questions as to the extent of any differences between Plaintiff's duties and her male comparators' duties, genuine issues of material fact exist as to Defendant's affirmative defense. Thus, the Defendant is not entitled to summary judgment.

II. Retaliation for raising concerns about discrimination against female faculty members

A plaintiff asserting a claim of retaliation under the EPA must prove: (1) she engaged in activity protected under the Act; (2) she subsequently suffered adverse action by her employer, and (3) a causal relationship between her protected activity and the adverse action. *Wolf v. Coco-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000). Defendant asserts that Plaintiff cannot carry her burden of proof on the first and third elements of this claim.

*Protected Activity*

Defendant argues that Plaintiff cannot show that she was engaged in the type of protected activity that can be the basis of a retaliation claim under the Equal Pay Act. Section 215(a)(3) of the EPA provides that it is unlawful for an employer to discriminate against an employee

> because such employee has *filed any complaint or instituted or caused to be instituted any proceeding* under or related to this chapter, or has *testified or is about to testify in any such proceeding*, or has served or is about to serve on an

  industry committee[.]

(emphasis added). Plaintiff's objections in the instant case do not fall within the *precise* language of the statute. The undisputed facts show that Plaintiff did not file a complaint, institute any proceeding or testify in a proceeding before Defendant asked her to resign; however, a plaintiff does not have to perform an act explicitly listed in the EPA's anti-retaliation provision to assert a violation of her rights. *See E.E.O.C. v. White and Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989). As the Eleventh Circuit found, "[T]he unofficial complaints expressed by the women to their employer about unequal pay constitute an assertion of rights protected under the [FLSA]". *Id.*

Plaintiff contends that she was demoted in retaliation for complaining to Dr. Capilouto about gender pay inequalities and protesting the use of a misleading matched pairs analysis of faculty salaries at UAB. These complaints are sufficient to assert her rights under the EPA's anti-retaliation provision. Thus, the Defendant is not entitled to judgment as a matter of law based on Dr. Scripa's failure to file a formal complaint.

*Causal Connection*

Defendants also contend that even if the court deems Plaintiff's objections and complaints as "protected activity," Plaintiff has failed to establish the requisite causal connection between that activity and the Defendant's decision to ask her to step down from her Associate Provost position.

One way to establish the required causal connection is through close temporal proximity between Plaintiff's activity and the Defendant's decision. In *Clark County School Dist. v. Breeden*, 532 U.S. 268 (2001), the U.S. Supreme Court held that when the employee asserts

temporal proximity between her employer's knowledge of protected activity and an adverse employment action as evidence of causality, the temporal proximity must be "very close." *Id.* at 273 (per curiam). The Defendant argues that Plaintiff Scripa has not presented evidence of a causal connection, i.e., a very close proximity between her protected activity and the termination of her duties as Associate Provost.

However, the record contains genuine issues of material fact as to whether Dr. Scripa's complaints were "very close" to Dr. Capilouto's decision to remove her from her administrative position. Plaintiff testified that she verbally made complaints to Dr. Capilouto regarding faculty salaries during her tenure as AP for FA-FD. Plaintiff's testimony is that she made such complaints *prior to the summer of 2006* time period. Dr. Capilouto did not push Plaintiff to resign until *the end of October*. However, Dr. Capilouto also testified that he made the decision to strip Plaintiff of her administrative duties "weeks before" he actually requested that she step down from her position on October 30, 2006.

"Weeks before" can mean two weeks before or ten weeks before. Based on the facts presented, Dr. Scripa could have complained on May 28, 2006–the day before summer began–and Dr. Capilouto could have decided to terminate her on May 29, 2006–weeks before he terminated her duties as AP for FA-FD on October 30th. Therefore, the court cannot conclude as a matter of law that the proximity between Plaintiff's speech and Dr. Capilouto's decision was not "very close." As such, the Defendant has not shown that a causal connection does not exist, as a matter of law, for purposes of Dr. Scripa's retaliation claim.

*Defendant's reasons for demoting Plaintiff . . . Pretext?*

Finally, the Defendant asserts that the court should grant its motion on Plaintiff's

retaliation claim because the evidence shows legitimate, non-retaliatory reasons for the Provost's decision to remove Plaintiff from her Associate Provost position. Dr. Capilouto testified about the reasons that he decided to remove Plaintiff from her administrative position. He stated that he was aware that Plaintiff struggled with managing her organization, personnel, and work. He also stated that instead of managing her staff so that they completed their assigned work, Plaintiff would unsuccessfully attempt to do their work herself. In addition, other deans complained that Plaintiff was not getting hiring and recruitment paperwork back to the schools in a timely fashion. Defendant contends that these reasons, not Plaintiff's complaints, were the reasons Dr. Capilouto decided to replace Plaintiff.

Despite all Defendant's proffered reasons, Plaintiff Scripa has presented evidence that raises issues of fact as to whether Defendant's reasons are pretextual. The Plaintiff has presented evidence that the Defendant refused to tell her why she was being demoted. The Eleventh Circuit has held that where the employer delays explaining to its employee why her employment has come to an end, a trier of fact could reasonably find that the subsequent reason constitutes pretext for discrimination. *Mock v. Bell Helicopter Textron, Inc.*, 196 Fed. App'x 773, 774 (11th Cir. 2006). The evidence presented by the Plaintiff shows that Dr. Capilouto did not explain why he was demoting her; instead, he just told her that she was not suited for the job and then refused to explain what he meant. According to Dr. Scripa, Dr. Capilouto never told her the numerous reasons for her termination that the Defendant now presents to the court. This discrepancy alone is enough to defeat the Defendant's motion for summary judgment.

**CONCLUSION**

For the reasons stated above, the court DENIES the Defendant's motion for summary

judgment. The court will simultaneously enter a separate order to that effect.

DONE and ORDERED this 20th day of January, 2010.

Karon O. Bowdre

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE